IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| SHANNON R.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00084 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Shannon R. asks this Court to review the Commissioner of Social Security's

final decision denying her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C.

§ 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the

applicable law, I cannot find that the decision is supported by substantial evidence. Accordingly,

I respectfully recommend that the decision be reversed and the case be remanded under the

fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42
U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Shannon applied for DIB in February 2016, Administrative Record ("R.") 334–35, and for SSI in May of that year, R. 336–44. She alleged that she became disabled on May 1, 2015, R. 334, 147, because of lupus, memory loss, fatigue, hypothyroidism, anxiety, and depression, R. 371. She was thirty-five years old, or a "younger person" under the regulations, on her alleged onset date. R. 147; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied both claims initially in July 2016, R. 128–63, and upon reconsideration that November, R. 164–207. In May 2019, Shannon appeared with counsel and testified at an administrative hearing before ALJ Deborah Foresman. R. 45–104. A vocational expert ("VE") also testified at this hearing. R. 93–103.

ALJ Foresman issued an unfavorable decision on June 26, 2019. R. 19–36. She found that Shannon had "severe" medically determinable impairments ("MDI") of depression and anxiety. R. 22 Most other medical conditions in Shannon's record—including a brain cyst, headaches, paresthesia of the arm, memory deficits, fibromyalgia, and unspecified convulsions—

were non-severe MDIs because "they cause[d] no more than minimal vocationally relevant limitations." *Id.* Additionally, because there was "no actual diagnosis of Lupus or epilepsy" in Shannon's record, and "objective medical evidence [did] not demonstrate" that she had either condition, they were "classified as non-medi[c]ally determinable impairments." *Id.* Shannon's "severe" mental impairments did not meet or medically equal a relevant Listing because they caused "no limitation[s]" in her overall abilities to understand, remember, or apply information and to adapt or manage herself; "mild limitation" in her overall ability to interact with others; and "at most, a moderate limitation" in her overall ability to concentrate, persist, or maintain pace. R. 22–24 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06).

ALJ Foreman then evaluated Shannon's residual functional capacity ("RFC") and determined that she could perform "a full range of work at all exertional levels," but that she had the following non-exertional limitations:

> she is limited to jobs that require no more than the ability to understand, remember and carry [out] short simple instructions in the performance of simple, routine and repetitive tasks while maintaining sufficient attention, concentration, persistence and pace to complete those tasks within all required perimeters. In addition, due to her anxiety and depression, she is never to be required to use ladders, ropes or scaffolds. Finally, also due to her anxiety and depression, she is never to be exposed to workplace hazards such as unprotected heights or dangerous machinery.

R. 25. Based on this RFC finding and the VE's testimony, ALJ Foreman concluded that Shannon was unable to perform her past relevant work, R. 34, but that jobs existed in significant numbers in the national economy that she could have performed, *id.*, including sorter, office helper, and taper, R. 35 (citing R. 97–103). Thus, she found that Shannon was "not disabled" from May 1, 2015, through the date of her decision. *Id.* The Appeals Council declined to review that decision, R. 7–12, and this appeal followed.

### III. Discussion

Shannon raises four challenges to ALJ Foresman's decision. *See generally* Pl.'s Br. 9–19,
ECF No. 16. First, she contends that the ALJ erred by not accounting for her "moderate"
limitations in concentration, persistence, and pace ("CPP") within her RFC finding, and by
failing to account for certain limitations attributed to her by DDS reviewing psychiatrist Jonathan
Zuess, M.D. *Id.* at 9–11. Second, she asserts that the ALJ erred in rejecting the opinion of Kelly
Milton, M.D. *Id.* at 11–15. Third, she argues that ALJ Foresman provided a legally insufficient
basis for rejecting the opinion of David Leen, Ph.D., a clinical psychologist who evaluated
Shannon in 2018. *Id.* at 15–16. Lastly, she contends that ALJ Foresman provided a legally
deficient explanation for finding many of her impairments were "not severe" and for her
conclusion that Shannon's symptoms[4] were less credible than she alleged. Shannon's first and
third arguments are persuasive, and her remaining arguments will not be addressed.

A.    *Summary*

Shannon visited neurologist Pritish Pawar, M.D., on May 12, 2015, complaining of
tingling and numbness in her arms for a week, memory loss, fatigue for the past year, word-
finding difficulties, and daily headaches. R. 583; *see* R. 569. On exam, Shannon was alert and
oriented to time, place, and person, her speech was articulate, and all physical findings were
normal. R. 585. Dr. Pawar noted that demyelinating disease, compressive neuropathy, cervical
radiculopathy, sleep disturbances, and depression contributed to her memory loss. R. 583. He
assessed memory impairment, chronic daily headache, analgesic rebound headache, snoring, and
paresthesia of arm. *Id.* Dr. Pawar ordered an MRI of Shannon's brain and cervical spine to
further evaluate her memory impairment and paresthesia of the arm, R. 583–84, 623, and
prescribed Propanolol for her chronic daily headaches, R. 583–84.

---

[4] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. §§
404.928(a), 416.928(a).

A brain MRI performed May 18 demonstrated "a faint 6 mm blush of enhancement identified along the subependymal region of the right frontal horn," which was "favored to reflect an incidental capillary telangiectasia which is a developmental vascular variant typically of no clinical significance," and there was "no corresponding T2/FLAIR signal abnormality to suggest this reflect[ed] an active demyelinating lesion." R. 623–24. The MRI also showed an "[i]ncidental pineal cyst." *Id.*

At a follow up visit May 19, it was noted that Shannon was frustrated by her memory issues, she "enjoy[ed] her work and [didn't] want to miss any more than she ha[d] to," but was "not sure what else she [could] do at th[at] point." R. 573 ("Has had fairly rapid onset of severe short and long term memory loss along w/ twitching and muscle weakness."). On exam, she was grossly non-focal neurologically, and her mood was anxious and tearful. R. 574. Joy Wolfe, M.D., assessed memory loss, paresthesia, and myalgia, and she recommended that Shannon follow up with a specialist. *Id.* In late June, Shannon had an appointment for medication review; she was about to lose her insurance and sought refills. R. 569. It was noted that she was in the process of undergoing testing for short-term memory loss. *Id.* Shannon had "just lost her job," and was "stressed about her short term memory loss." *Id.* She was taking Xanax and Wellbutrin, and she reported that Wellbutrin improved her mood. *Id.* Examination findings were all unremarkable. R. 570. Shannon was assessed with memory loss, anxiety, and depression. *Id.* A second brain MRI taken in October revealed no acute intercranial abnormality, and a "[s]mall focus of enhancement along the ventricular aspect of the right caudate head" that "may relate to a venous structure." R. 500. A follow-up MRI was recommended in three months "to ensure stability and exclude an underlying lesion such as neoplasm" or other brain tumor. *Id.*; *see* R. 525.

In November, Shannon presented to Kelly Milton, M.D., at Barrow General Neurology for her memory loss issues. R. 537. It was noted that Shannon's symptoms began about six months prior. *Id.* She reported that her arms began to tingle suddenly at work, the tingling spread to her legs after a couple of hours, she went to the emergency room but no cause for her symptoms was discerned, and she had experienced memory difficulties ever since. *Id.* She was "barely able to carry out activities of daily living," and she had "trouble driving because she often forgets where she was going and why." *Id.* She also reported trouble following conversations, answering questions, and finishing her own sentences. *Id.* On exam, Dr. Milton observed that Shannon "ha[d] a lot of trouble describing her issues," as she "would start to answer the question, but would then (usually after saying about 10 words) ask for the question to be repeated." *Id.* She could explain "how her troubles started—the episode of tingling—but ha[d] trouble describing the rest of her symptoms," including "whether her memory troubles are constant, or whether they occur more intermittently." *Id.* (noting that Shannon's presentation "ma[de] history gathering difficult"). Shannon correctly recalled the city, state, and county she was in as well as the day of the week, month, and year, but she did not recall the season or date. She remembered three words recited to her on an immediate-recall task, but she could only remember one word after a three-minute delay. *Id.* When instructed to (1) take a piece of paper in her right hand, (2) fold it in half, and (3) place it on the floor, Shannon completed the second step, but not the first or third steps. *Id.* ("Patient was able to complete the following instructions: folds paper in half. [Number] correct (max 3) = 1."). Shannon was in no distress and cooperative, R. 539, and she had normal mood and affect, R. 540. She had diminished temperature sensation in her left lower extremity and decreased (4-/5 to 4+/5) strength in all muscle groups except her right bicep, triceps, and quadricep. R. 540. Dr. Milton assessed memory disorder and spells. *Id.*

She noted that the cause of Shannon's complaints of pain, spells, tingling, and memory trouble were unclear, and she ordered an EEG and thyroid-function lab study. R. 541.

In January 2016, Shannon requested refills of Wellbutrin, Xanax, and Celexa, which were noted to make her mood and anxiety "fairly stable." R. 566. She reported constant pain and continued memory problems "due to pain," constant fatigue, pain with walking, numbness in her fingers, tightness in all muscles, and "black out" episodes. *Id.* Shannon could no longer drive because of her memory loss, saying she was "not safe on the road." *Id.* She had pain/stiffness in flexion, extension, and rotation, pain with palpation over her upper arms and anterior thighs, and anxious mood. R. 567. Dr. Wolfe assessed anxiety, depression, myalgia, and paresthesia. *Id.* He refilled her medications and prescribed Neurontin. *Id.* In February, Dr. Milton wrote a "To Whom It May Concern" letter, stating that Shannon could not "currently work due to severe cognitive troubles." R. 763. Dr. Milton noted that her problems lacked a formal diagnosis "as the work-up ha[d] been hampered by lack of insurance," but said that Shannon "ha[d] very legitimate and real symptoms that have rendered her unable to work." *Id.* Dr. Milton diagnosed Shannon with "memory disorder – spells" on March 25, 2016. R. 742.

A few days later, Shannon told Dr. Milton she continued to experience memory difficulties, and she had daily headaches that were worse with light, noise, and exertion. R. 764. She got blurred vision if she tried to read things "close up," had arm and leg pain, and was "much improved" after starting on Gabapentin. R. 764. On exam, Shannon was cooperative, in no distress, and had normal mood and affect, but had "trouble holding index finger, thumb together against resistance bilaterally, more prominently on the right, difficulty holding thumb, 5th finger together against resistance, more prominent on right." R. 766–67. She also had widespread sensory deficits, R. 767, and reduced strength in nearly all muscle groups, R. 766.

8

Dr. Milton assessed hand weakness, sensory loss, weakness, "uncompensated short term memory deficit," neuropathic pain, other headache syndrome, depression, and anxiety, among other disorders. *Id.* Dr. Milton ordered imaging on Shannon's spine, prescribed Xanax, and continued her on Prednisone, Levothyroxine, Cyclobenzaprine, Gabapentin, and Celexa. R. 768. A brain MRI taken that day demonstrated "[l]ess well seen right caudate head enhancing focus, most compatible with incidental capillary telangiectasia." R. 525 ("Provided Indications: Brain Tumor.").

        In April, Shannon saw Arin Lamoureaux, FNP, seeking a referral to a new neurologist because Dr. Milton's clinic did not accept her insurance plan. R. 563; *see* R. 735. She continued to report memory loss and trouble maintaining a conversation. On exam, she had normal mood and affect, but she was forgetful and unable to hold a conversation. R. 564 ("Forgetful, can't remember []or track the conversation, constantly asking what did you ask[?], couldn't remember what medications she is taking."). FNP Lamouraeux assessed impaired memory and thought process alteration, and she advised Shannon not to drive because of her memory impairments. *Id.* When Shannon saw Dr. Wolfe in May, she reported that she could not work because her short-term memory was "completely gone and she cannot concentrate long enough sometimes to even remember her own" birthdate. R. 619. The "stress of having memory lapses affect[ed] her anxiety and mood, also." *Id.* (spelling corrected). Examination revealed pain and stiffness with flexion and extension of her neck, pain with palpation over the paraspinous muscles of her cervical spine bilaterally, tenderness over the parasternal area of her chest wall, tenderness over the paralumbar spinous muscles and the lumbar spine region, and anxious mood. R. 620. In June 2016, Dr. Milton wrote another "To Whom It May Concern" letter stating that "based on [her] assessment" from March 2016, Shannon "was unable to work given severe cognitive deficits." R.

735 ("[She] is in effect disabled."). Shannon's "symptoms [were] consistent with lupus[,] although her lab testing was normal." *Id.* But, Dr. Milton also noted that Shannon's most recent lab results were processed by Theranos, which had "already voided all 2014 and 2015 results" because of "some issues with reliability and accuracy [at] the lab." *Id.*

Also in June 2016, DDS reviewer Jonathan Zuess, M.D., opined as to Shannon's mental impairments and RFC. *See* R. 140, 142–44, 157, 159–61. He found that Shannon's severe affective disorder and anxiety disorder caused "mild" restrictions overall in her activities of daily living; "moderate" difficulties overall in maintaining both social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation. R. 140, 157 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06 (2016)). More specifically, those impairments "moderately limited" Shannon's abilities to follow "detailed" instructions; "maintain attention and concertation for extended periods"; "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "complete a normal workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace" without taking "unreasonable" breaks; interact appropriately with the general public; get along with coworkers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior in the workplace. R. 142–43, 159–60. They did "not significantly limit[]" her abilities to "remember locations and work-like procedures"; follow "very short and simple instructions"; "sustain an ordinary routine without special supervision"; work with or around others "without being distracted by them"; make "simple work-related decisions"; "ask simple questions or request assistance"; or "accept instructions and respond appropriately" to supervisors. R. 143–44, 159–61; *see* R. 143, 160 ("Available data suggest that the [claimant] is able to carry out simple instructions, follow simple work-like procedures, and

10

make simple work-related decisions."). She did not have any impairment-related adaption limitations. R. 144, 161. Dr. Zuess explained that, while the "available evidence indicate[d]" Shannon had "the basic mental functional capacities necessary to perform simple work on a sustained basis," *id.*, she also "appear[ed] to have a moderately impaired ability to sustain attention throughout extended periods of time . . . [and] perform at a consistent pace and maintain a 40 hour work schedule without interference from symptoms," R. 143, 160. She "may perform best in settings with limited social interactions," R. 144, 161, considering evidence that she had only "a fair ability to interact appropriately with the general public and co-workers," R. 143–44, 161.

In August, Shannon was evaluated by Natalie Tejada, NP, for possible lupus. R. 651. Examination revealed "full ROM, although obvious discomfort with any movement" and "tenderness to palpation of any extremity"; normal or slightly decreased (-5/5) muscle strength throughout; "normal/symmetrical" grips bilaterally; and an antalgic gait. R. 652. Shannon was visibly "shaking throughout [the] visit." *Id.* NP Tejada assessed memory changes, confusion, tachycardia, back pain, joint pain, fatigue, and paresthesia, and she referred Shannon to a new neurologist. *Id.* Shannon saw Brandon Woods, M.D., of the Phoenix Neurological Institute, a few days later. R. 648. Her symptoms included memory difficulties, confusion, fatigue, seizures, dizziness, and anxiety. *Id.* Shannon reported "worsening of her seizure events over the last few weeks," and her symptoms varied from day to day. *Id.* On exam, she displayed euthymic mood, reactive affect, normal "memories, concentration, attention, language, and fund of knowledge," normal bulk and tone, 5/5 strength in her bilateral upper and lower extremities, and narrow based but steady gait. R. 649 ("General medical examination was unremarkable."). Dr. Woods assessed

unspecified convulsions, memory difficulty, episodic confusion, and paresthesia, and he ordered

and EEG to further evaluate her "progressively worsening" seizure-like episodes. *Id.*

Shannon followed up with Dr. Woods in October to review her EEG results, which were

noted to have shown "no abnormalities." R. 672; *see also* R. 694 ("This EEG is normal. No

focal, diffuse or generalized abnormalities were noted."). She reported feeling worse overall,

having "an increased number of what she calls seizures," worsening low back pain, tremor in her

upper extremities, and anxiety. R. 672. On exam, she was oriented times three, displayed 5/5

strength in her extremities, and had narrow based and steady gait. *Id.* Dr. Woods assessed

transient alteration of awareness, confusion, back pain, and tremor. R. 672–73. He ordered a

video ambulatory EEG for her transient alteration of awareness, prescribed Lyrica for her back

pain, started her on a trial of Propranolol for tremor, and ordered her to follow up in four weeks.

R. 673.

Alysha Teed, Ph.D. completed a psychological evaluation of Shannon later in October for

DSS. R. 695. Dr. Teed noted that Shannon was "limited in her activities and [did] not go out

often." R. 695. She observed that Shannon's mental conditions appeared secondary to her

physical distress, and she noted that her "worries about health represent ongoing themes." R.

699. Dr. Teed observed that Shannon's style was cordial and appropriate, her ability to

comprehend basic instructions appeared intact, her awareness and mental capacity to follow

through with instructions and successfully complete assigned tasks appeared limited by

preoccupations with health concerns, she appeared capable of managing changes in an otherwise

stable environment, expected reactions to stress included somatic complaints and concentration

struggles, and her general social skills "appear[ed] adequate with sufficient ability to interact

with others." *Id.* Dr. Teed diagnosed adjustment disorder with mixed anxiety and depressed

12

mood. R. 699. She opined that Shannon "appear[ed] capable of comprehending recall of short and simple, repetitive instructions," but that "[a]s instruction becomes complex, detailed, or long she may struggle with retention." R. 701. Shannon's "ability to maintain concentration for extended periods may be affected by interference from reported pain," and she appeared "able to interact with the general public, respond to criticism from supervisors and get along with peers and co-workers with little difficulty." *Id.*

In November 2016, DDS psychologist Hillary Weiss, Ph.D., assessed Shannon's mental RFC after reviewing her updated medical records, including Dr. Teed's assessment, which she said deserved "great weight." R. 178, 182–84, 203–05. While Dr. Weiss agreed with parts of Dr. Zuess's earlier assessment, *see* R. 178, 182–83, 199, 203–05, she generally found that Shannon's severe anxiety and affective disorders were not as functionally limiting as Dr. Zuess indicated. For example, she opined that those impairments caused no specific work-related limitations in Shannon's social functioning, R. 178, 183, 199, 204, and that they did "not significantly limit[]" her abilities to follow "detailed" instructions or "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." R.183, 204. She agreed that Shannon's impairments "moderately limited" her abilities to "maintain attention and concertation for extended periods"; to "complete a normal workday or workweek without interruption from psychologically based symptoms[;] and to perform at a consistent pace" without taking "unreasonable" breaks. R. 183, 204. Asked to "explain in narrative form the [identified] sustained concentration and persistence capacities and/or limitations," Dr. Weiss wrote that Shannon was "capable of sustaining CPP for at least simple tasks," but that "limitations may arise from anxiety" symptoms. *Id.*

In December, Shannon presented to the Maricopa Integrated Health System for an evaluation of her physical and neurological symptoms. R. 858. She was cooperative on exam, R. 859, and displayed 5/5 strength in all extremities, normal cervical and lumbosacral spine ROM, and positive "tender points soft tissue." R. 860. Konstantinos Paperis, M.D., assessed lumbar spine pain, fibromyalgia ("FM"), and chronic pain syndrome. R. 860. Dr. Paperis noted "FM overlap with features of somat[o]form disorders (manifested with widespread pain, paresthesias, migraines, . . . brain fog, memory issues, sleep disturbances, anxiety, depression)" without signs or symptoms of rheumatoid arthritis "or other connective tissues disease," and he attributed Shannon's back pain to fibromyalgia. *Id.*

In January 2017, Shannon saw Dr. Woods again for "intermittent episodes of confusion, dizziness, memory difficulty, whole body pain, possible seizures and severe mid back pain." R. 900. Her primary complaints were memory difficulty and issues with word finding. *Id.* On exam, she was alert and oriented times three, had normal bulk and tone, 5/5 strength in all extremities, and narrow based and steady gait. *Id.* Dr. Woods assessed memory changes, back pain, confusion, and transient alteration of awareness. R. 900–01. In April, Shannon followed up with Dr. Woods. R. 898. She was taking Gabapentin, Propranolol, Celexa, and Wellbutrin. *Id.* Dr. Woods's examination findings were unchanged. *Id.* Dr. Woods assessed paresthesia, back pain, and anxiety, and he increased her Gabapentin dosage. R. 899.

In August 2017, Shannon presented to the emergency department ("ED") at Sentara RMH Medical Center, complaining of generalized body aches. R. 775. She had just moved to Virginia from Arizona and reported she was out of her medications and did not have insurance or access to the local free clinic. R. 776–77. She complained of "diffuse pain, especially in her left arm." R. 777. On exam, Shannon was "chronically unwell-appearing," but appeared fairly

14

comfortable, and she displayed normal neck, back, and extremity ROM, intact strength and sensation, anxious affect with "very pressured speech," normal insight, and her "conversation [was] rather disjointed at times." R. 778–79. Shannon returned to the ED in December. She complained of a syncopal episode that morning and reported multiple syncopal episodes that month. R. 794. Exam findings were unremarkable, including normal thought content and decision making. R. 796. A brain CT scan showed no evidence of an acute intercranial abnormality. R. 798. The attending physician diagnosed syncope and collapse and discharged Shannon home in stable condition. R. 799.

In August 2018, Shannon presented to the Shenandoah County Free Clinic to establish care; she was not taking any medication at that time. R. 827. It was noted that Shannon was an "excellent historian" and "[n]o evidence of memory loss" was noted. R. 828. Aside from papules on her skin, examination findings were unremarkable, and Regina Wardwell, FNP, assessed joint pain and anxiety and prescribed Celexa. R. 829. In November, it was noted that there was "[n]o evidence of fibromyalgia or Lupus in [Shannon's] symptoms or extensive labs." R. 937.

Later in November, David Leen, Ph.D., performed a psychological evaluation of Shannon. R. 878–80. She reported difficulties with concentration and recall when carrying out detailed instructions, forgetfulness in conversations, frequent worry about her health, and persistent fatigue. R. 879. On exam, her speech was rapid, pressured, and rambling, and her "[t]hought processes appear[ed] circumstantial and moderately to markedly distractible in that at times she [was] persistently unable to verbalize a complete thought without shifting to another topic." *Id.* She displayed anxious mood and dysphoric and restricted affect, but was adequately motivated throughout the exam. *Id.* Dr. Leen noted that Shannon's "functioning in the areas of attention and concentration, judgment, recall, and abstract thinking were estimated o[n] the basis

of the detail with which she conveyed her past history and current mental status and on the basis

of her answers to several additional questions" during his evaluation. *Id.* He further explained

that her "clinical behavior" during specific psychological subtests "suggest[ed] less than average

level functioning in the area of attention and concentration"; her remote memory appeared

grossly intact "based on her self-reported background information and medical psychiatric

history"; and her "[i]nsight [was] partial in that she recognizes she is undergoing significant

anxiety and in need of treatment." *Id.* "In view of the current clinical suggestions of deficits in

the areas of attention and concentration and [Shannon's] current complaint of difficulties with

attention and concentration and recall," he recommended that she undergo a "formal cognitive

assessment" to further evaluate or "rule out unspecified neurocognitive disorder." R. 880.

Dr. Leen opined that Shannon's "persistent fatigue" and clinical behavior during his

evaluation—specifically her "anxious mood, distractibility/tangentiality, [and] rapid and

pressured and rambling speech"—rendered her "currently unable to consistently perform work

activities of any kind in a timely and appropriate manner with or without additional supervision";

"unable to maintain reliable attendance in the a work place"; "moderately to markedly" limited

in her ability to deal appropriately and effectively with supervisors, coworkers, and the public in

a vocational setting; unable to complete a normal workweek without interruptions from her

anxiety; and "currently unable to deal with the usual stresses of competitive work on a consistent

full-time basis." *Id.* (explaining that these limitations were "secondary to [Shannon's] anxious

mood, distractibility/tangentiality, rapid and pressured and rambling speech, [and] persistent

fatigue").

A few days later, Dr. Leen completed a medical source statement. *See* R. 875–76. He

opined that Shannon had "mild" or "slight" limitations understanding and carrying out simple

instructions, "moderate" limitations making judgments on simple work-related decisions, moderate to marked limitations understanding complex instructions, and "marked" or "serious" limitations carrying out complex instructions and making judgments on complex work-related decisions. R. 875. Further, he opined that she had moderate to marked limitations in her abilities to interact appropriately with the public, supervisors and coworkers and to respond appropriately to usual work situations and changes in a routine work setting. R. 876. Asked to "identify the factors" that supported his opinions, Dr. Leen cited Shannon's "anxious mood, distractibility/tangentiality, rapid and pressured speech, [and] persistent fatigue." *Id.*; *see* R. 875 ("Anxious mood, distractibility/tangentiality, persistent fatigue."). Dr. Leen also found that Shannon's "other capabilities (such as the ability to concentrate, persist, or maintain pace and the ability to adapt or manage oneself) [were not] affected by [her] impairment[.]" R. 876.

In February 2019, Shannon presented to the Shenandoah Community Health Center for a follow up visit. R. 918. She complained of fainting attacks, memory loss, and confusion. R. 919. Shannon was a good historian on exam, she was alert and conscious, her leg was "shaking very dramatically but stops when distracted," she was cooperative, and her memory and judgment were intact. R. 920. The attending physician diagnosed syncope and collapse, R. 920.

B.    *The ALJ's Decision*

ALJ Foresman discussed much of this evidence in her written decision. *See* R. 23–33. At step two, she found that Shannon's depression and anxiety were "severe" impairments because they "significantly limit [her] ability to perform basic work activities," R. 22, which according to the regulations include mental functions like following "simple instructions," exercising judgment, responding appropriately to other people and usual work situations, and dealing with changes in a routine work setting, *see* 20 C.F.R. §§ 404.1521(b)(3)–(6), 416.921(b)(3)–(6).

17

Those severe impairments were not presumptively disabling, however, because they caused "no limitation[s]" overall in understanding, remembering, or applying information and adapting or managing herself; "mild limitation" interacting with others; and "at most, a moderate limitation" concentrating, persisting, or maintaining pace ("CPP"). R. 23–24 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(B), 12.06(B) (eff. Jan. 17, 2017)). ALJ Foresman explained that Shannon had "moderate" limitation in CPP because she "was occasionally found to have some minor difficulty concentrating by her health care providers. However, the record shows that the claimant has had differing living arrangements since her alleged onset date" in May 2015. R. 23. "At one point, she lived alone in Arizona. At a another point she lived with [a] friend of her mother's in Virginia." R. 23–24. [S]he can care for all of her personal needs" and "performs multiple household chores," including "preparing meals for herself on a regular basis." R. 24. *But see* R. 78–80, 82–85. She moved "across the country from Arizona to Virginia" and "indicated that she work[ed] as a caregiver for an elderly person helping them with their personal care in exchange for a place to live." R. 24. *But see* R. 78–79, 87–88. She was teaching herself Spanish using a smart-phone application and "is also an artist, creates works of art[,] and has a portfolio." R. 24. *But see* R. 84 ("Like I said, I've tried doing art, because that was something I used to be passionate about, but I struggle to even do that anymore. . . . I've been trying to teach myself Spanish, which it's been five years now, and I'm like 30% fluent."). She drove 35 miles one-way to a consultative evaluation, and she "indicated that she can use the Uber computer application to summon transportation to and from various destinations" or "use public transportation." *Id.* Finally, Shannon's "concentration, attention, language[,] and fund of knowledge were all found to be within normal limits." *Id.* ALJ Foresman did not cite any evidence in Shannon's record to support these findings. *See* R. 23–24, 30.

18

Turning to the RFC assessment, ALJ Foresman summarized Shannon's subjective statements regarding her symptoms, R. 29–30, summarized the objective medical evidence and other evidence, R. 25–29, and evaluated the opinion evidence of record, R. 31–34. She found that Shannon maintained an RFC to perform a full range of work at all exertional levels, except she was "limited to jobs that require no more than the ability to understand, remember and carry out short simple instructions in the performance of simple, routine and repetitive tasks while maintaining sufficient attention, concentration, persistence, and pace to complete those tasks within all required perimeters," and, because of her anxiety and depression, she could never climb ladders, ropes, or scaffolds, or be exposed to workplace hazards. R. 25. In making that determination, ALJ Foresman found that, although Shannon's MDIs "could cause some of [her] alleged symptoms," Shannon's statements describing "the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" later in her decision. R. 29. For example, she found that Shannon's allegations were "not congruent" and "not consistent with the . . . daily activities" that ALJ Foresman had identified when evaluating Shannon's overall limitations in the four broad functional areas. R. 30 (citing R. 23–24). She also highlighted various normal findings on MRIs and physical or mental-status exams that were "not in line with" Shannon's allegations. R. 30–31.

The ALJ afforded "significant, but not great, weight" to Dr. Zuess's and Dr. Weiss's medical opinions. She evaluated those opinions collectively as follows:

> They found that the claimant had an anxiety disorder and an affective disorder. However, despite these impairments, the consultants determined that the claimant retained the capacity to understand, remember and carry out short, simple instructions. They found she could remember locations and work like procedures. In addition, the consultants found the claimant had the ability to sustain an ordinary routine without special supervision. They also found that the claimant

19

could work in coordination with, or in proximity to, others without being
distracted by them. They found that she had the ability to make simple work-
related decisions. They also found that the claimant could ask simple questions or
request assistance. Finally, they found that the claimant had the ability to accept
instructions and respond appropriately to criticism from supervisors.

R. 31. The ALJ concluded that "[t]hese assertions [were] mainly consistent with the record as a

whole" and therefore gave "them significant, but not great, weight" in crafting Shannon's RFC.

*Id.* Her summary identified only those functional areas where Dr. Zuess and/or Dr. Weiss opined

that Shannon's mental capacities were not limited at all, or "not significantly limited," by her

severe anxiety and depression. *See* R. 142–44, 159–61, 199, 204. She did not mention that the

opinions also conflicted in material respects, *compare* R. 142–43, 159–60, *with* R. 183, 204, or

that both doctors opined Shannon was "moderately limited" in her abilities to "maintain attention

and concertation for extended periods," to "complete a normal workday or workweek without

interruption from psychologically based symptoms[,] and to perform at a consistent pace"

without taking "unreasonable" breaks. R. 143, 160, 183, 204.

        The ALJ then turned to Dr. Leen's consultative opinions. According to the ALJ's

summary, Dr. Leen had "opined that, secondary to her reported anxious mood and alleged

distractibility, [Shannon] was unable to consistent[ly] perform work of any kind." R. 32. *But see*

R. 880 ("Secondary to the claimant's anxious mood, distractibility/tangentiality, rapid and

pressured and rambling speech, [and] persistent fatigue, she is currently unable to consistently

perform work activities of any kind in a timely and appropriate manner with or without

additional supervision."). "He found that [her] ability for dealing appropriately and effectively"

with other people in a work setting was "moderately to markedly impaired. He also found that

[Shannon] was unable to complete a normal workweek without interruptions resulting from her

*alleged* anxiety disorder symptoms." R. 32 (emphasis added). *But see* R. 880 ("Throughout the

current examination, her statements appeared internally consistent and consistent with

information in [the] currently available medical record regarding a history of problems with

anxiety. . . . She is unable to complete a normal work week without interruptions resulting from

her anxiety disorder symptoms."). The ALJ concluded that "[t]hese assertions [were] not

consistent with the record as a whole. In addition, they appear[ed] to be, in large part, based on

[Shannon's] subjective allegations," R. 32, which the ALJ had already discounted as "not

consistent with [her] daily activities and the objective medical evidence," R. 30. Thus, she gave

those aspects of Dr. Leen's opinion "little weight." R. 32 (citing R. 880). She also gave "only

limited weight" to his opinions that Shannon had "moderate" to "marked" limitations dealing

with "complex" instructions or work-related decisions, interacting appropriately with other

people, and responding appropriately to usual situations and routine changes in the workplace, R.

32 (citing R. 875–76), because they were "generally not consistent with the evidence as a

whole," *id.* Dr. Leen's opinion that Shannon "had only mild impairment" in her ability to follow

"simple instructions," on the other hand, was "mainly consistent with the record and [was] given

significant, but not great, weight" in the RFC determination. *Id.* (citing R. 875). The ALJ did not

cite any evidence in the record to support the differing weights she gave these medical opinions.

C.    *Analysis*

        Shannon's arguments challenge the ALJ's RFC assessment. *See generally* Pl.'s Br. 9–19.

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an

ordinary work setting" for eight hours a day, five days a week (or equivalent schedule) despite

her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2,

1996) (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should

assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because

RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC itself should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015) (restrictions identified at step three). Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and built an "accurate and logical bridge from that evidence to [her] conclusion[s]," *Woods*, 888 F.3d at 694. *See Thomas*, 916 F.3d at 311–12; *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662–63 (4th Cir. 2017).

Shannon first argues that ALJ Foresman's RFC determination is deficient because although she found that Shannon had "moderate" limitations maintaining CPP, she failed to account for those limits in her RFC finding. Pl.'s Br. 9–10. Shannon contends that ALJ Foresman's RFC restricting her to "jobs that require no more than the ability to understand, remember and carry [out] short[,] simple instructions in the performance of simple, routine and repetitive tasks while maintaining sufficient attention, concentration, persistence, and pace to

complete those tasks within all required perimeters" does not sufficiently account for her "moderate" CPP limits. *Id.* at 9 (quoting R. 25).

When an ALJ at step three finds a "moderate" limitation maintaining concentration, persistence, or pace, she must either specifically account for that work-related limitation in the RFC finding or explain why such a restriction is unnecessary. *Mascio*, 780 F.3d at 638; *cf. Patterson*, 846 F.3d at 659 (noting that the "RFC assessment is a holistic and fact-specific evaluation" and "the ALJ cannot conduct it properly without reaching detailed conclusions" at steps two and three about the "type and severity of the claimant's [mental] impairments"); *Claiborne v. Comm'r, Soc. Sec. Admin.*, Civ. No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015) ("The conclusions at step [three] are supposed to represent reasoned consideration of all of the pertinent evidence, and are not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step."). Merely restricting the claimant to "simple, routine tasks or unskilled work"[5] is not sufficient because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638 (internal quotation marks omitted). Thus, the ALJ's decision must include a narrative discussion, citing relevant evidence in the record, explaining either how the

---

[5] "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). The Commissioner's policy also "explicitly defines unskilled work in terms of basic work activities: 'The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Adams v. Colvin*, No. 1:15cv733, 2016 WL 6238559, at *8 (M.D.N.C. Oct. 25, 2016) (quoting SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985)); *see* 20 C.F.R. §§ 404.1521(b)(3)–(6), 416.921(b)(3)–(6); *Adams*, 2016 WL 6238559, at *8 (noting a logical inconsistency between ALJ's step-two finding that claimant's mental impairments were "severe" because they "cause[d] significant limitations in her ability to perform basic work activities" and ALJ's RFC finding that claimant "could perform a full range of unskilled work" despite those impairments).

RFC accommodates the ALJ's finding that the claimant's mental impairment(s) cause "moderate" overall limitations in sustaining CPP or why, notwithstanding that prior finding, this moderate limitation "does not affect" the claimant's ability to "stay on task" for a full workday and normal workweek. *Mascio*, 780 F.3d at 638; *see, e.g.*, *Lonie B. v. Comm'r of Soc. Sec. Admin.*, No. DLB-19-1424, 2020 WL 2097683, at *4 (D. Md. May 1, 2020) (remanding under *Mascio* where ALJ discussed relevant medical evidence, but "offered no explanation as to why Plaintiff's issues with concentration and persistence did not affect his ability to sustain work over an eight-hour workday"); *Mark T. v. Berryhill*, No. CBD-18-0513, 2019 WL 2250575, at *4 (D. Md. May 23, 2019) (ALJ's "detailed explanation of the evidence in the record" was insufficient where ALJ failed to explain whether the mental RFC's specific limitations adequately addressed claimant's moderate limitation in CPP).

Here, because ALJ Foresman found at step three that Shannon had "moderate" CPP limits, she was required either to include specific work-related restrictions within her RFC finding to accommodate for such "moderate" CPP limits, or to explain why such limits did not translate into Shannon's RFC. *Mascio*, 780 F.3d at 638. The ALJ did neither here, and remand is thus warranted.

ALJ Foresman's RFC finding includes essentially two restrictions on Shannon's ability to do mental work activities despite her severe depression and anxiety: (1) following "short simple instructions"; and (2) performing "simple, routine and repetitive tasks." *See* R. 25. The phrase "while maintaining sufficient attention, concentration, persistence and pace to complete those tasks within all required perimeters," *id.*, is an affirmative finding that Shannon can work within "all required," yet unspecified, "perimeters." *Cf. Thomas*, 916 F.3d at 312 ("[W]hile the ALJ stated that Thomas could not perform work 'requiring a production rate or demand pace,' she did

24

not give us enough information to understand what those terms mean. That makes it difficult, if not impossible, for us to assess whether their inclusion in Thomas's RFC is supported by substantial evidence."). It is not clearly an additional or more restrictive limitation on Shannon's abilities to follow short, simple instructions and do simple, routine, and repetitive tasks. *Cf. Danielle B. v. Saul*, No. 4:20cv27, 2021 WL 2845317, at *10 (W.D. Va. July 8, 2021) (ALJ's finding that claimant "could 'concentrate, persist or maintain a pace consistent with the ability to perform unskilled work'" was not a restriction separate from the limitation to "unskilled work"). As noted, limiting Shannon to "simple, routine and repetitive tasks" does not accommodate her "moderate" limitations maintaining CPP because Shannon's ability to perform simple tasks differs from her ability to stay on task. *Mascio*, 780 F.3d at 638.

The ability to follow "simple instructions" is necessary to perform "unskilled work," and thus does little, if anything, to address the *Mascio* Court's concern that limiting the claimant to "unskilled work" does not necessarily account for her moderate difficulties maintaining concentration, persistence, or pace. Similarly, the ability to follow instructions differs from the ability to concentrate on or persist in a task. ALJ Foresman did not explain how restricting Shannon to short, simple instructions "logically address[ed]" her moderate limitations maintaining concentration, persistence, or pace. *Danny S. v. Saul*, No. 5:19cv74, 2021 WL 263370, at *3 (W.D. Va. Jan. 27, 2021) ("Importantly, the restriction provided in the RFC must logically address concentration, persistence, and pace."); *see also Yates v. Comm'r of Soc. Sec.*, 4:16cv59, 2018 WL 1249926, at *11 (W.D. Va. Feb. 16, 2016) ("[T]he ALJ must explain, citing relevant evidence from the record, how restricting the claimant to such tasks accounts for her actual limitations in maintaining concentration, persistence, or pace."). Finally, to the extent ALJ Foresman intended to address Shannon's moderate limitations maintaining CPP by adding the

25

phrase, "while maintaining sufficient attention, concentration, persistence and pace to complete those [simple, routine and repetitive] tasks within all required perimeters" to her RFC finding, R. 25, she did not explain what she meant by "all required perimeters" and she did not cite any evidence to support her apparent finding that Shannon could work within those parameters, *see* R. 29–34. *See Woods*, 888 F.3d at 694 ("[T]he ALJ must *both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from [that] evidence to his conclusion."); *cf. Richardson v. Saul*, No. 4:19cv128, 2020 WL 3816317, at *5–7 (E.D.N.C. June 9, 2020) (reversing and remanding where ALJ found claimant would be "off task up to nine percent of the workday," but did not explain "where the nine-percent figure came [from] and why this limitation adequately account[ed] for [her] limitations"). "That makes it difficult, if not impossible, for [the Court] to assess whether [its] inclusion in [Shannon's] RFC is supported by substantial evidence." *Thomas*, 916 F.3d at 312. Accordingly, I find that the ALJ did not sufficiently accommodate Shannon's "moderate" CPP limitations within her RFC finding.

Relatedly, Shannon argues that the ALJ erred by failing to account for the other "moderate" limitations that Dr. Zuess identified in his RFC assessment. Pl.'s Br. 10–11. Specifically, she argues that the ALJ did not account for Dr. Zuess's findings that Shannon was "moderately limited" in her abilities to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior. Pl.'s Br. 9; R. 143, 160.

In assigning weight to the various opinions of record, the ALJ observed that "[s]tate agency medical consultants also evaluated the claimant's mental impairments." R. 31. She grouped both DDS reviewers' opinions together, noting "they found" that Shannon "had an anxiety disorder and an affective disorder," but "the consultants" nonetheless "determined that [Shannon] retained the capacity to understand, remember, and carry out short, simple instructions." *Id.* Further, ALJ Foreman noted that both DDS reviewers found that Shannon "could remember locations and work like procedures," "had the ability to sustain an ordinary routine without special supervision," "could work in coordination with, or in proximity to, others without being distracted by them," could "make simple work-related decisions" and "ask simple questions or request assistance, and "had the ability to accept instructions and respond appropriately to criticism from supervisors." *Id.* ALJ Foreman found "[t]hese assertions [were] mainly consistent with the record as a whole," and she afforded them "significant, but not great, weight" in crafting Shannon's RFC. *Id.*

"A district court will not revisit the ALJ's resolution of conflicting evidence. However, if the ALJ appears, without stating a reason, to have credited some probative evidence over other evidence or to have ignored evidence altogether, a remand or reversal may be necessary." *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002). This is precisely what the ALJ did here. First, while both DDS reviewers did opine that Shannon either had no limits or was not significantly limited in the functions identified by ALJ Foreman in her decision, their opinions varied in several other respects. For instance, whereas Dr. Zuess opined that Shannon was moderately limited in her abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, R. 143, 160, Dr. Weiss found Shannon was "not significantly limited" in these areas, R. 183, 204. And, although Dr. Zuess found

Shannon to be "moderately limited" in her abilities to interact appropriately with the general

public and to get along with coworkers or peers without distracting them or exhibiting behavior

extremes, R. 143, 160, Dr. Weiss opined that Shannon had no social interaction limitations at all,

R. 183, 204.The ALJ's RFC finding more closely tracks Dr. Weiss's opinion in both respects.

Despite these conflicting findings, the ALJ grouped both opinions together, only

mentioning certain findings where both reviewers were in agreement. And, even then, she only

mentioned those areas where the DDS reviewers agreed on findings suggesting an absence of

disability while appearing to ignore findings that tended to support Shannon's allegations and/or

Dr. Leen's medical opinion. *See Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider

all relevant medical evidence and cannot simply cherrypick facts that support a finding of

nondisability while ignoring evidence that points to a disability finding." (quoting *Denton v.

Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). For instance, both Dr. Zuess and Dr. Weiss opined

that Shannon was "moderately limited" in her abilities to maintain concentration for extended

periods, to complete a normal workday and workweek without interruptions from

psychologically based symptoms, and to perform at a consistent pace without an unreasonable

number and length of rest periods. The ALJ, however, never mentioned these findings. Nor does

she mention the additional limitations that Dr. Zuess identified, including that Shannon had

"moderate" limitations in maintaining social functioning. R. 140. Moreover, although the ALJ

found the DDS reviewers' selected "assertions [were] mainly consistent with the record as a

whole," she did not cite any evidence supporting that conclusion.

Thus, it is unclear whether the ALJ considered these conflicting findings and rejected

them for a legitimate reason grounded in the available evidence, or whether she improperly

ignored them. *See Bobby P. v. Comm'r of Soc. Sec.*, No. 4:19cv17, 2020 WL 6537650, at *7

(W.D. Va. Nov. 6, 2020) ("Moreover, the [DDS reviewers'] opinions contained some differences: Dr. Bockner assessed marked limitations in interacting with the public, whereas Dr. Leizer found moderate limitations. The ALJ's failure to acknowledge, let alone explain how she reconciled, this conflicting evidence creates a significant gap in the ALJ's rationale."). Further, even assuming these findings were considered, the ALJ did not offer any reason why she credited some of the doctors' findings over others. *See Michael B. v. Saul*, No. 7:19cv751, 2020 WL 7497803, at *7 (W.D. Va. Dec. 21, 2020) ("While an ALJ is under no obligation to accept any medical opinion, . . . . '[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted.'" (quoting SSR 96-8p, 1996 WL 374184, at *7)); *cf. Warren v. Astrue*, No. 2:08cv3, 2008 3285756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to adequately explain his rationale for rejecting the opinions of those whom he otherwise gave great weight to in arriving at his decision."). As such, the ALJ failed to "build an accurate and logical bridge from the evidence to [her] conclusion," and remand is warranted. *Monroe*, 826 F.3d at 189; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (explaining that "it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence" when it appears she "ignore[d] an entire line of evidence that is contrary to the ruling").

Shannon further asserts that the ALJ erred by rejecting Dr. Leen's opinions. Pl.'s Br. 15–16. Dr. Leen performed a consultative evaluation of Shannon in November 2018. R. 878–80. He opined that Shannon could not work secondary to her anxious mood, distractibility/tangentiality, rapid and pressured and rambling speech, and persistent fatigue. R. 880. He found she was unable to maintain reliable attendance in a workplace; she had moderate to marked limitations in

her ability to deal appropriate and effectively with supervisors, coworkers, and the public in a vocational work setting; she was unable to complete a normal workweek without interruptions resulting from her anxiety disorder symptoms; and she was "currently generally unable to deal with the usual stresses of competitive work on a consistent full-time basis." *Id.* Dr. Leen also filled out a medical source statement as to Shannon's mental capabilities. R. 875–77. He opined she had "mild" limitations in her abilities to understand and carry out simple instructions, "moderate" limitations in her ability to make judgments on simple work-related decisions, moderate to marked limitations in her ability to understand complex instructions; and "marked" limitations in her abilities to carry out complex instructions and to make judgments on complex work-related decisions. R. 875. He also opined Shannon had moderate to marked limitations in her abilities to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting. R. 876.

The ALJ summarized Dr. Leen's narrative opinion and many of his exam findings. R. 32. She assigned that opinion "little weight," reasoning that it was "not consistent with the record as a whole," and "appear[ed] to be, in large part, based on [Shannon's] own subjective allegations." *Id.* The ALJ also summarized Dr. Leen's medical source statement, giving "significant, but not great, weight" to his finding that Shannon had only a "mild" limit in her ability to understand and carry out simple instructions," but finding that "the remaining assertions in the checkbox form are generally not consistent with the evidence as a whole" and assigning them "limited weight." *Id.* She did not cite any evidence in the record to support those conclusions.

"Medical opinions" are statements from "acceptable medical sources," such as physicians and psychiatrist, that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, prognosis, functional limitations, and remaining

abilities. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). For claims filed before March 2017, the ALJ must adequately explain the weight afforded to every medical opinion in the record, taking into account the nature and extent of the source's treatment relationship with the claimant; how well the source explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the source's area of specialty. *Id.* §§ 404.1527(c), 416.927(c). Medical opinions from examining sources, such as consultative psychologists, typically deserve more weight than those from non-examining sources, such as the DDS medical reviewers. *Brown*, 873 F.3d at 268; 20 C.F.R. §§ 404.1527(c), 416.927(c). Nevertheless, an ALJ may rely on a non-examining source's medical opinion when there is "sufficient indicia of supportability in the form of a high quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion." *Woods*, 888 F.3d at 695; 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

ALJ Foresman's evaluation of Dr. Leen's opinions is not supported by substantial evidence. First, as Shannon points out, the ALJ did not cite to any specific evidence that she found "not consistent" with Dr. Leen's opinions or explain how and why she reached this conclusion. Dr. Leen's opinions are undoubtedly inconsistent with some of the evidence of record. *See, e.g.*, R. 570, 670, 675 (unremarkable examinations); R. 649 (normal memory, concentration, attention, language, and fund of knowledge). Nonetheless other evidence in the record could bolster his conclusions. *See, e.g.*, R. 763 (Dr. Milton letter stating Shannon could not "currently work due to severe cognitive troubles"); R. 564 (unable to hold a conversation on exam); R. 143, 160 (Dr. Zuess finding social interaction limitations). The ALJ needed to resolve these inconsistencies, and she needed to say how she reached her conclusion as to the

consistency of Dr. Leen's opinion with the other evidence of record and upon which evidence

that conclusion was based. *See Monroe*, 826 F.3d at 191 ("Without more specific explanation of

the differing weights he assigned various medical opinions, neither we nor the district court can

undertake meaningful substantial-evidence review."). She failed to do so here, and thus her

finding that Dr. Leen's opinion was "not consistent" with the other evidence of record is not

supported by substantial evidence.

The ALJ's second reason for assigning "little weight" to Dr. Leen's opinion—that it was

based, in large part, on Shannon's subjective reports—likewise fails the substantial evidence test.

An ALJ may properly reject a medical opinion that is based primarily on the claimant's

subjective reports. *See Edwin M. v. Saul*, No. 4:19cv46, 2021 WL 1565415, at *10 (W.D. Va.

Apr. 21, 2021) ("An ALJ may discount a medical opinion that is based on a claimant's reported

symptoms rather than on the physician's medical findings." (citing *Craig*, 76 F.3d at 590 n.2)).

The ALJ here, however, cited no evidence supporting her finding that Dr. Leen relied on

Shannon's own statements, rather than his objective findings, in formulating his opinions. *Id.*

(finding error where "the ALJ did not explain what evidence he relied on to make" his

determination that a medical opinion was based on the claimant's reports and not objective

findings).

The need for such an explanation was particularly important here, where Dr. Leen said

explicitly that his opinions were "[b]ased on the current clinical interview data," and that his

proposed work-related limitations were "[s]econdary to" his findings that Shannon exhibited

"anxious mood, distractibility/tangentiality, [and] rapid and pressured and rambling speech"

during the clinical evaluation. R. 880; *see also* R. 875–76 (citing the same findings); R. 879

("Her functioning in the areas of attention and concentration, judgment, recall, and abstract

thinking were estimated o[n] the basis of the detail with which she conveyed her past history and current mental status and on the basis of her answers to several additional questions [on psychological tests]. Her clinical behavior in these respects suggests less than average level of functioning in the area of attention and concentration."). Dr. Leen's reference to "persistent fatigue" does not appear in his exam findings, but that was only one of four factors he cited to support his assessment of Shannon's work-related limitations. *See* R. 875–76, 879–80. Additionally, a medical source has more leeway to rely on a claimant's subjective reports when mental impairments are at issue. *Edwin M.*, 2021 WL 1565415, at *10 ("[M]ental health conditions are often diagnosed based on subjective reports and are not as susceptible to objective observation as physical conditions may be."); *see also Thompson v. Berryhill*, No. 4:18cv133, 2019 WL 2980030, at *12 (E.D.N.C. Apr. 22, 2019) ("In general, a psychiatrist . . . has more leeway in relying on the subjective statements of a patient than a provider dealing with physical conditions."). Thus, the ALJ needed to explain how she reached her conclusion that Dr. Leen based his opinions on her subjective statements as opposed to his own findings. She did not do so here. As such, the ALJ's effective rejection of Dr. Leen's consultative opinion because his findings "appear[ed] to be, in large part, based on [Shannon's] subjective allegations" was error. R. 32.

Accordingly, I cannot find that the ALJ's evaluation of Dr. Leen's opinions is supported by substantial evidence. *See Bratten v. Astrue*, No. SAG-09-cv-1821, 2011 WL 260684, at *5 (D. Md. July 6, 2011) ("The ALJ did not refer to any evidence that contradicted Dr. Fox's medical opinion and did not provide any facts in support of his assertion that Dr. Fox had relied primarily on the Claimant's subjective complaints. Such an assertion is purely speculative and is not an accurate characterization of the record.").

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**GRANT** Shannon's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's

Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision,

**REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case

from the Court's active docket.

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: March 4, 2022

Joel C. Hoppe
United States Magistrate Judge